KABLITZ, Respondent, v. HOEFT and another, Appellants.

*October 26—November 24, 1964.*

For the appellants there were briefs by *Lowry, Hunter & Tikalsky* and oral argument by *James L. Steimel,* all of Waukesha.

For the respondent there was a brief by *Hippenmeyer & Reilly* of Waukesha, and oral argument by *William F. Reilly.*

WILKIE, J.   Four issues are raised on this appeal:

1. Did the court err in allowing an orthopedic surgeon engaged by the defendant insurance company to be called as an adverse witness by the plaintiff?

2. Did the court err in failing, as requested by the defendants, to instruct the jury that no damages could be awarded for plaintiff's osteomyelitis?

3. Were the damages awarded to plaintiff supported by the evidence?

4. Should a new trial be granted in the interest of justice?

### *Calling Defendants' Doctor Adversely.*

At the request of defendants' counsel, Dr. Alfred Kritter, an orthopedic surgeon, examined Kablitz, sent his report to those attorneys, and was then paid by Farmers Mutual. The trial court deemed him an agent of Farmers Mutual under sec. 325.14, Stats.,[1] and permitted respondent to call him adversely.  This was error.

In holding that Dr. Kritter was an agent of the defendant insurance company the trial court stated:

---

[1] "325.14 ADVERSE EXAMINATION AT TRIAL; DEPOSITION AS EVIDENCE; REBUTTAL. (1) Any party or any person for whose immediate benefit any civil action or proceeding is prosecuted or defended, or his or its assignor, officer, agent or employe, or the person who was such officer, agent or employe at the time of the occurrence of the facts made the subject of the examination, may be examined upon the trial as if under cross-examination, at the instance of any adverse party."

"The term agent in general designates those employments where the persons exercising them are not under the immediate control of a superior. A person authorized by another to act on his account and under his control is an agent. An attorney under many circumstances may be the agent of his client. The independent contractor and agent are distinguished by the right of control the employer exercises. The employer here exercises exactly what type examination he desires, to whom copies shall be sent, the right to determine whether the doctor shall be called as a witness, and the right to engage or not engage the doctor again. The company has, of course, no right to determine the final conclusion of the doctor. A doctor who generally examines patients for an insurance company is, in the opinion of the Court, an agent of such company."

It is well established that the most-important factor in determining whether a person is an agent is the extent of the control retained over the details of the work.[2] There was no proof here that Farmers Mutual reserved any right to control the details of the examination or exerted any influence over such examination. There is nothing in the record to indicate that Dr. Kritter was regularly engaged by Farmers Mutual to examine claimants. Thus, with respect to this examination Dr. Kritter was pursuing a distinct occupation or business (the practice of an orthopedic surgeon) apart from that of the person who engages the services (insurance of liability growing out of automobile accidents).[3] He kept his own office and furnished his own instrumentalities of the examination.[4] He was an independent contractor and not an agent of the insurance company.

[2] *Bond v. Harrel* (1961), 13 Wis. (2d) 369, 108 N. W. (2d) 552.
[3] *Boehck Construction Equipment Corp. v. Voigt* (1962), 17 Wis. (2d) 62, 115 N. W. (2d) 627, 117 N. W. (2d) 372.
[4] *Bond v. Harrel, supra,* footnote 2. The court enumerated factors that point to the status of an independent contractor: ". . . the place of work, the time of employment, the method of payment, the right of summary discharge of employees, the nature of the business or

Respondent contends that unless he is able to call appellants' doctor adversely under sec. 325.14, Stats., the only way he will be able to learn the results of the examination is to call the doctor on direct and take the chances that go with making him his own witness. Respondent overlooks the fact that a discovery examination may be conducted of the doctor (even though not an agent) prior to trial under sec. 326.12,[5] and that the defendant may be compelled to supply the plaintiff with a copy of the doctor's report under the provisions of sec. 269.57.

Sec. 326.12, Stats., before the 1961 amendment, allowed the adverse examination before trial only of a party or of a person standing in certain specified relationships to a party, *e.g.,* an agent of a party.[6] Sec. 325.14, was not changed at the same time and there is nothing to show that the legislature intended any change in the statute that required a person to be in one of the designated relationships to an adverse party, *e.g.,* an agent, before he could be called adversely at the trial.

Sec. 326.12, Stats., as amended in 1961, was changed to conform with the federal rule on discovery before trial.[7] The federal rule corresponding to sec. 325.14, provides:

"A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also,

occupation, which party furnishes the instrumentalities or tools, and the intent of the parties to the contract." (p. 374.)

[5] Sec. 326.12, Stats.; ch. 113, Laws of 1961.

[6] Sec. 326.12 (1), Stats. 1959.

[7] 28 USCA, p. 286, Federal Rules Civil Procedure, Rule 26.

and may be cross-examined by the adverse party only upon the subject matter of his examination in chief." [8]

This rule permits the adverse examination on trial of an agent only if he is a special type of agent, *i.e.,* a managing agent, as defined by the rule.

Even though the court erred in finding Kritter an agent and in permitting him to be called adversely, such error, to warrant reversal must have been prejudicial to Farmers Mutual.[9] His testimony, which would be held against the defendant, concerned only the nature and extent of a knee injury, a matter not in dispute. Appellants were in no way prejudiced by any error committed in allowing Dr. Kritter to be called adversely.

### *Instruction as to Plaintiff's Osteomyelitis.*

Appellants requested the court to instruct the jury that no damages could be awarded for respondent's osteomyelitis because there was no evidence that this condition was affected in any manner by the collision. This request was denied and the jury was instructed that no damages could be awarded for this pre-existing condition unless it was "brought into activity as a natural result of the injuries received in the collision."

The osteomyelitis condition involving his right upper thighbone was originally caused by a gunshot wound received in 1935. Kablitz was hospitalized for about eight months at the time of the accident, and only worked part time from 1936 until 1940. The condition reoccurred in 1940 and Kablitz was once more hospitalized, this time for over half a year. In 1946 or 1947 the wound again began to

---

[8] 28 USCA, p. 271, Federal Rules Civil Procedure, Rule 43 (b).
[9] *Shine v. Hagemeister Realty Co.* (1919), 169 Wis. 343, 172 N. W. 750.

drain but he was not hospitalized. The condition then remained dormant until two or three days after the accident, when Kablitz experienced symptoms and about three or four days later, the condition reoccurred. Dr. Raschbacher, the physician who attended respondent, testified that it was his opinion "to a reasonable medical certainty that the fact that Mr. Kablitz was in this accident . . . was a cause of the flare up." He testified on cross-examination that if the symptoms arose three or four days after the accident, and the drainage started three or four days after that, he "could not state to a reasonable medical certainty" that the accident reactivated the condition. Appellants contend that this testimony negates the opinion given on direct examination. His testimony is not inconsistent because the opinion elicited on cross-examination is based on assumption rather than fact. Kablitz testified that the symptoms occurred two or three days after the collision, not three or four.

Appellants' witness, Dr. Kritter, testified that "the overall course of osteomyelitis [would not] have been appreciably affected by any injuries received." He then testified, however, that "an injury such as this, if there was a good [preexisting] pocket of pus, would accelerate the drainage."

In *Leusink v. O'Donnell* [10] the court said:

"It is apparent from the record that the plaintiff, prior to the accident, had some disability in his left arm and left leg, resulting from some form of sclerosis. The medical reports in the record indicate that the plaintiff was suffering from a partial paralysis of the left arm and left leg after the accident. Plaintiff's disability, both before and after the accident, affected the same parts of his person and the same bodily functions. Therefore the extent to which his disabilities are attributable to the accident will be a question for the jury."

The expert testimony boils down to one flat assertion that the collision reactivated the osteomyelitis and one opinion

---

[10] (1949), 255 Wis. 627, 631, 39 N. W. (2d) 675, 677.

that the accident would have aggravated the condition only if drainage was about to occur anyway. Considering these opinions, in light of the respondent's testimony that the condition was completely dormant for fourteen years prior to the collision, arising again only shortly after the crash, there was sufficient evidence of causal relationship to necessitate the instruction given.

### Damages.

Appellants submit that the evidence does not support the damage awards of $6,950 for past and future wage loss, and $3,000 for past and future pain and suffering, and disability. The amount of damages awarded is a matter resting largely in the discretion of the jury. The verdict will not be upset merely because the award was large or because the reviewing court would have awarded a lesser amount, but rather only where it is so excessive as to indicate that it resulted from passion, prejudice, or corruption, or a disregard of the evidence or applicable rules of law.[11] Evidence must be viewed in the light most favorable to the verdict.[12] A damage verdict which has been approved by the trial court will not be disturbed if "there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of plaintiff."[13]

The test for damages resulting from loss of wages is what the plaintiff's services might be worth to him in his ordinary employment.[14] Kablitz is a portrait salesman. In 1961,

[11] *Olson v. Siordia* (1964), ante, p. 274, 130 N. W. (2d) 827; *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 103 N. W. (2d) 907.

[12] *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 92 N. W. (2d) 884.

[13] *Boodry v. Byrne* (1964), 22 Wis. (2d) 585, 589, 126 N. W. (2d) 503, 505.

[14] *Kowalke v. Farmers Mut. Automobile Ins. Co.* (1958), 3 Wis. (2d) 389, 88 N. W. (2d) 747.

during the nine months prior to the accident, his earnings averaged $402 per month. Projecting these earnings for the entire year of the accident and comparing the total with his actual income discloses an $800 loss, which he is clearly entitled to.

In 1959 and 1960, when he made between 50 and 60 house calls a week, his total earnings were $5,889 and $6,084 respectively. In 1962 and 1963, when he could only make between 20 and 35 calls, his total income was $4,948 and $4,724 (eleven months) respectively. Thus Kablitz, who had a life expectancy of twenty-three years at the time of the trial, earned approximately $1,000 less in each of the two years subsequent to the accident than he did the two years before it.

Appellants, however, ignore the 1959–1960 income and argue that since Kablitz's average monthly earnings for the nine months preceding the accident are substantially the same as his present earnings, there was no loss. We disagree. A period of nine months is not fairly representative of his past average income and precludes the possibility of increased portrait sales due to the Christmas season, which would raise his overall earnings average. Even if his 1959, 1960, and 1961 incomes are averaged and compared with his present income, he would still lose between $400 and $500 a year. Considering his life expectancy, this loss alone would sustain the verdict.

The damages awarded for loss of wages can be sustained even if the osteomyelitis condition was not reaggravated by the collision. The testimony shows that this condition caused no permanent disability. The knee injury prevented him from climbing stairs and forced a reduction in the number of stops he could make in a week.

Appellants also take issue with the award of $3,000 for past and future pain and suffering, and disability. Both doctors agree that Kablitz suffered a permanent degenera-

tive injury (chondromalacia) to his right knee. Dr. Rasch-bacher estimated a permanent disability. There were also injuries to his other knee, right hand, and nose. These injuries continued to pain him at the time of the trial. The injury to the right knee made it difficult to climb stairs. He did not regain normal use of his hand until a year and a half after the accident. He experienced headaches three or four times a week up to the time of the trial and had severe back pains for six or eight months after the collision. In addition, he suffered the usual temporary pains and bruises. He had to sleep in a separate bedroom because the pain made him restless. Before the accident he participated in athletics, fishing, hunting, and bowling, but his activity now is restricted to dart ball. The only dispute in regard to the nature or extent of the injuries is whether the osteomyelitis was caused by the accident. Even assuming that the osteomyelitis was not reactivated by the collision, Kablitz's other injuries were of sufficient severity to sustain an award of $3,000.

Considering all the evidence, it cannot be said that the jury verdict in regard to wage loss or pain and suffering was unjustified.[15]

### New Trial in the Interest of Justice.

The power of this court to grant a new trial in the interest of justice, pursuant to sec. 251.09, Stats., is to be exercised only sparingly and with great caution.[16] Viewing the case as a whole, there has not been a miscarriage of justice.[17]

By the Court.—Judgment affirmed.

[15] Springen v. Ager Plumbing & Heating, Inc. (1963), 19 Wis. (2d) 487, 120 N. W. (2d) 692.

[16] Graff v. Roop (1959), 7 Wis. (2d) 603, 97 N. W. (2d) 393.

[17] Mack Trucks, Inc., v. Sunde (1963), 19 Wis. (2d) 129, 119 N. W. (2d) 321.